KILPATRICK TOWNSEND & STOCKTON LLP
Eric B. Evans (SBN 232476)
EEvans@ktslaw.com
1302 El Camino Real
Suite 175
Menlo Park, California 94025
Telephone: 650 326 2400
Facsimile: 650 326 2422

Attorneys for Plaintiffs
DRS Network & Imaging Systems, LLC
and Leonardo DRS, Inc.

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

DRS NETWORK & IMAGING SYSTEMS, LLC, a Delaware limited liability company, and LEONARDO DRS, INC., a Delaware corporation,

Plaintiffs,

v.

HARVEY SPENCER, a citizen of California,

Defendant.

Case No. ______________________

**COMPLAINT FOR:**

**(1) Misappropriation of Trade Secrets Under the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.*;**
**(2) Misappropriation of Trade Secrets Under the California Uniform Trade Secrets Act, Cal. Civ. Code § 3426 *et seq.*;**
**(3) Violation of the California Comprehensive Computer Data Access and Fraud Act, Cal. Penal Code § 502;**
**(4) Breach of Contract;**
**(5) Breach of the Duty of Loyalty;**
**(6) Conversion;**
**(7) Unfair Competition, Cal. Bus. & Prof. Code § 17200 *et seq.***

**DEMAND FOR JURY TRIAL**

## INTRODUCTION

1. DRS Network & Imaging Systems, LLC ("NIS") designs the optical and forward-looking infrared ("FLIR") systems that let American warfighters see in the dark, track threats across the sky, and identify targets at distances the naked eye cannot reach. That capability is not the product of a single breakthrough. It is the product of years of engineering, hundreds of millions of dollars of investment, and the labor of specialists who spend careers refining a single lens geometry. It exists in files—Zemax design files, lens prescriptions, glass catalogs, sensor architectures—and those files *are* the company. Strip them away and what remains is a payroll.

2. Defendant Harvey Spencer ("Spencer") was a senior optical engineer at NIS with a security clearance and access to Plaintiffs' most sensitive design data. On or about June 26, 2026, he casually informed a co-worker that he was going "to work for [a competitor] … and they gave me a start date of July 13." On July 16, 2026, Spencer formally informed Human Resources he was resigning effective July 24. On information and belief, he began working for his new employer—NIS's direct competitor—no later than August 3, 2026, and possibly as early as July 13, 2026. During that window (June 26–July 24), he moved highly sensitive, confidential design files out of Plaintiffs' systems in volume: a 58.98-megabyte archive containing 51 optical tracker and sensor designs on July 12; 66 files sent directly to his email account at his new employer on July 17; and 525 files sent to a personal Gmail account across seven emails the same evening. Then, on July 22, in a nine-minute span, he tried to delete more than 6,000 files from NIS's systems. These are not contested allegations built on inference—they are drawn from Plaintiffs' own forensic records, which capture each transmission by timestamp, recipient, and file count:


From: Spencer, Harvey <harvey.spencer@drs.com>
Sent on: Friday, July 17, 2026 7:26:30 PM
To: harvey.m.spencer@[redacted]
Subject: FW: files
Attachments: ring_lens_for_Jeremy_input_aiming_normal_facet_focu
KB), lenses_to_seqs.seq (5.97 KB), Harvey_Ground_De
Harvey_Ground_Demo_design_SET_UP_FOR_PUPIL
T#TRK_reoptimized_from_proposal_by_Eric.env (2.9
T2TRK_MWIR_proposal_design_reoptimized_with_fie
T2TRK_MWIR_proposal_design_reoptimized_with_fie
T3TRK_MWIR_proposal_design_Eric_Ford.len (54.81

The illustration above shows key metadata from Spencer's July 17 email from his NIS email address to his email address at his new employer, with the relevant fields called out and magnified for clarity.

3. The files Spencer took relate to the Tracking Layer Tranche 3 ("TRKT3") payload, the Tracking Layer Tranche 2 ("TRKT2") proposal, and NIS's ground demonstration for the Space Development Agency ("SDA")—active programs, competitively bid, on which Plaintiffs and Spencer's new employer compete directly. A substantial portion of the information he stole is Controlled Unclassified Information generated under U.S. Government contracts and may be subject to the International Traffic in Arms Regulations ("ITAR") and the Export Administration Regulations ("EAR"). That data now sits in a personal Gmail account and inside a competitor's email system, outside every control NIS built to protect it. NIS gave Spencer an opportunity to fix this before filing: a July 31 demand letter with a five-business-day deadline. What came back was a two-sentence commitment hedged by a self-judging exception—a promise not to use NIS's trade secrets except when Spencer decides he may. That is not sufficient to protect NIS's trade secrets. Despite further correspondence, Spencer has not agreed to the most basic requirement to protect those trade secrets: a forensic inspection to ensure that all copies are deleted from any device or media where they may be found.

## JURISDICTION AND VENUE

4. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the Defend Trade Secrets Act (the "DTSA"), 18 U.S.C. § 1836 *et seq*. The DTSA provides that "[a]n owner of a trade secret that is misappropriated may bring a civil action under this subsection if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1). Congress further directed that "[t]he district courts of the United States shall have original jurisdiction of civil actions brought under this section." 18 U.S.C. § 1836(c).

5. The interstate and foreign commerce requirement is satisfied. NIS's optical and FLIR systems are sold to the United States Department of Defense and allied foreign governments under contracts valued in the hundreds of millions of dollars. The TRKT3, TRKT2, and SDA programs at issue are federal defense programs administered by agencies of the United States Government. NIS develops these systems across multiple states, including California, Florida, and Texas. The exfiltrated design data relates to products deployed both domestically and abroad, and Spencer's new employer competes for the same interstate and international defense contracts.

6. This Court has supplemental jurisdiction over Plaintiffs' state-law claims under 28 U.S.C. § 1367(a) because those claims are so related to the federal DTSA claim that they form part of the same case or controversy under Article III of the United States Constitution.

7. This Court has personal jurisdiction over Defendant. Defendant Harvey Spencer resides at 28125 Lobrook Drive, Rancho Palos Verdes, California 90275, in Los Angeles County. He committed the acts giving rise to this action in this District.

8. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because Defendant Spencer resides in this judicial district and under 28 U.S.C. § 1391(b)(2)

because a substantial part of the events or omissions giving rise to the claims occurred in this District, including the exfiltration of trade secrets from Plaintiffs' California-based systems, Spencer's commencement of employment at his new employer, and the attempted deletion of files from Plaintiffs' servers accessible in this District.

9. Pursuant to Central District of California Local Rule 83-1.1, this action is properly assigned to the Western Division because the events giving rise to the claims occurred in Los Angeles County, Defendant is located in Los Angeles County, and Plaintiffs maintain operations in Los Angeles County.

## PARTIES

10. Plaintiff DRS Network & Imaging Systems, LLC ("NIS") is a wholly-owned subsidiary of Plaintiff Leonardo DRS, Inc. ("Leonardo DRS"). NIS is a Delaware limited liability company that designs, develops, and manufactures advanced optical, electro-optical, and infrared systems, including FLIR sensors, optical trackers, and missile warning systems for United States and allied defense programs.

11. Plaintiff Leonardo DRS is a Delaware corporation with its principal place of business at 2345 Crystal Drive, Suite 1000, Arlington, VA 22202. Leonardo DRS is a leading defense technology company that provides advanced sensing, network computing, force protection, and electric power and propulsion solutions to the U.S. military, intelligence community, and allied nations worldwide.

12. Defendant Spencer is an individual residing at 28125 Lobrook Drive, Rancho Palos Verdes, California 90275. Spencer was employed by NIS as a senior optical engineer. He held a security clearance and had authorized access to NIS's most sensitive trade secret design data during his employment. His work email address was harvey.spencer@drs.com. His personal email address is

glasair470@gmail.com. His email address at his new employer is harvey.m.spencer@[new employer].com.

## FACTUAL ALLEGATIONS

### A. Plaintiffs' Trade Secret Information and Protective Measures

13. Plaintiffs have invested hundreds of millions of dollars and decades of specialized engineering effort developing proprietary optical and infrared sensor designs. These designs include, but are not limited to, Zemax optical design files, lens prescriptions, glass catalogs, sensor architecture specifications, thermal models, and stray-light analyses that collectively embody Plaintiffs' competitive advantage in the defense electro-optical market.

14. Plaintiffs maintain comprehensive administrative, technical, and physical safeguards to protect their trade secrets. These measures include a Cyber/IT Acceptable Use Policy ("CITG-001"), which governs the handling of proprietary information. A true and correct copy of CITG-001 is attached hereto as Exhibit 1.

15. Section 4.5.1 of CITG-001 prohibits employees from transmitting proprietary or export-controlled information to personal email accounts. Section 4.5.4 prohibits the unauthorized removal of proprietary data from company systems. Section 3.3.7 requires employees to safeguard trade secrets and confidential business information. Section 3.3.8 requires immediate reporting of any suspected unauthorized disclosure. Section 3.3.4 mandates role-based access controls limiting access to proprietary data to employees with a demonstrated need to know. Section 2.2 reserves Plaintiffs' right to monitor all electronic communications and system activity on company networks.

16. All NIS employees, including Spencer, are required to acknowledge and agree to the DRS Code of Ethics and Business Conduct ("Code of Ethics"), which imposes confidentiality obligations and prohibits the disclosure of proprietary information to unauthorized persons or entities. Spencer acknowledged

the Code of Ethics then in effect, in March 2009. A true and correct copy of the Code of Ethics that is currently in effect is attached hereto as Exhibit 2.

17. Plaintiffs require employees with access to sensitive design data to complete periodic training on the protection of proprietary and export-controlled information. Spencer completed his most recent training in November 2025, approximately eight months before the exfiltration at issue. This training specifically addressed the prohibition on transmitting proprietary information to personal email accounts and the restrictions on removing company data without authorization.

18. Plaintiffs implement role-based access controls limiting access to proprietary design data to employees with a demonstrated need to know. As a senior optical engineer, Spencer was granted access to design files for programs on which he was actively working, including the TRKT3 and TRKT2 programs and the SDA ground demonstration. That access was granted solely for the purpose of performing his duties for NIS and was subject to the confidentiality and use restrictions set forth in CITG-001 and the Code of Ethics.

19. Spencer held a security clearance throughout most or all of his employment at NIS, which imposed additional obligations regarding the handling of sensitive information. His clearance required him to protect not only classified material but also Controlled Unclassified Information ("CUI") generated under government contracts, much of which constitutes NIS trade secret information.

**B. Spencer's Systematic Exfiltration**

20. On information and belief, on or before June 26, 2026, Spencer received and accepted an offer of employment from a competitor of NIS at a facility in Los Angeles County. He did not formally inform NIS of this acceptance or submit a resignation until July 16, 2026. In the interim, he continued reporting to work at NIS and accessing Plaintiffs' systems and proprietary data.

21. On July 12, 2026, Spencer created and transmitted a compressed archive file named "T3TRK_optical_designs.zip" to his personal Gmail account (glasair470@gmail.com). The archive was 58.98 megabytes in size and contained 51 separate optical tracker and sensor design files relating to the TRKT3 program. These files constitute trade secrets of Plaintiffs and include Zemax lens prescriptions, ray-trace models, and tolerance analyses developed over years of engineering effort at costs of hundreds of millions of dollars.

22. On July 17, 2026, at approximately 7:26 p.m. Pacific Time, Spencer transmitted 66 files containing NIS proprietary design data directly to his email address at his new employer (harvey.m.spencer@[new employer].com). These 66 files included design files, specifications, and engineering analyses relating to active NIS programs on which NIS and Spencer's new employer compete directly. The transmission of NIS trade secrets directly to a competitor's email system evidences Spencer's intent to use or disclose these secrets for his new employer's benefit.

**From:** Spencer, Harvey <harvey.spencer@drs.com>
**Sent on:** Friday, July 17, 2026 7:26:30 PM
**To:** harvey.m.spencer@[redacted]
**Subject:** FW: files
**Attachments:** ring_lens_for_Jeremy_input_aiming_normal_facet_focus_above_the_center_and_output_facet.ZDA (758.69 KB), ring_lens_for_Jeremy_input_aiming_normal_facet_focus_above_the_center_and_output_facet.zos (237.31 KB), T1_OpticalDesign_20221020.zmx (33.47 KB), lenses_to_seqs.seq (5.97 KB), Harvey_Ground_Demo_design.len (68.3 KB), Harvey_Ground_Demo_design_SET_UP_FOR_PUPIL_AREA_MACRO.1.len (67.85 KB), Harvey_Ground_Demo_design_SET_UP_FOR_PUPIL_AREA_MACRO.env (278.67 KB), Harvey_Ground_Demo_design_SET_UP_FOR_PUPIL_AREA_MACRO.len (67.87 KB), proposal_design_set_up_for_collecting_area_analysis.len (62.84 KB), proposal_design_set_up_for_x_and_y_efl_macro.len (55.37 KB), T#TRK_reoptimized_from_proposal_by_Eric.env (2.9 MB), T2TRK_MWIR_proposal_design_reoptimized.1.len (66.15 KB), T2TRK_MWIR_proposal_design_reoptimized.env (1.3 MB), T2TRK_MWIR_proposal_design_reoptimized.len (65.77 KB), T2TRK_MWIR_proposal_design_reoptimized_with_field_angles_for_calc_of_decentered_EOD.1.len (66.09 KB), T2TRK_MWIR_proposal_design_reoptimized_with_field_angles_for_calc_of_decentered_EOD.2.len (66.09 KB), T2TRK_MWIR_proposal_design_reoptimized_with_field_angles_for_calc_of_decentered_EOD.env (1.19 KB), T2TRK_MWIR_proposal_design_reoptimized_with_field_angles_for_calc_of_decentered_EOD.len (66.09 KB), T3TRK_MWIR_proposal_design_Eric_Ford.len (54.81 KB), T3TRK_reoptimized_from_proposal_by_Eric.1.len (65.09 KB), T3TRK_reoptimized_from_proposal_by_Eric.len (65.09 KB), T3TRK_reoptimized_from_proposal_by_Eric_one_of_more_worse_Monte_Carlo_examples.1.len (64.42 KB), T3TRK_reoptimized_from_proposal_by_Eric_one_of_more_worse_Monte_Carlo_examples.env (5.19 MB), T3TRK_reoptimized_from_proposal_by_Eric_one_of_more_worse_Monte_Carlo_examples.len (64.42 KB), T3TRK_reoptimized_from_proposal_by_Eric_set_up_for_pupil_area.1.len (61.69 KB), T3TRK_reoptimized_from_proposal_by_Eric_set_up_for_pupil_area.2.len (61.75 KB), T3TRK_reoptimized_from_proposal_by_Eric_set_up_for_pupil_area.3.len (61.75 KB), T3TRK_reoptimized_from_proposal_by_Eric_set_up_for_pupil_area.4.len (61.75 KB), T3TRK_reoptimized_from_proposal_by_Eric_set_up_for_pupil_area.5.len (61.9 KB), T3TRK_reoptimized_from_proposal_by_Eric_set_up_for_pupil_area.6.len (63.91 KB), T3TRK_reoptimized_from_proposal_by_Eric_set_up_for_pupil_area.env (7.86 MB), T3TRK_reoptimized_from_proposal_by_Eric_with_assumed_tolerances_for_Monte_mid_level_degradation_case.1.len (65.21 KB), T3TRK_reoptimized_from_proposal_by_Eric_with_assumed_tolerances_for_Monte_mid_level_degradation_case.env (518 Bytes), T3TRK_reoptimized_from_proposal_by_Eric_with_assumed_tolerances_for_Monte_mid_level_degradation_case.len (65.21 KB), T3TRK_reoptimized_from_proposal_by_Eric_with_assumed_tolerances_for_tolfdif.1.len (79.44 KB), T3TRK_reoptimized_from_proposal_by_Eric_with_assumed_tolerances_for_tolfdif.2.len (79.44 KB), T3TRK_reoptimized_from_proposal_by_Eric_with_assumed_tolerances_for_tolfdif.3.len (60.28 KB), T3TRK_reoptimized_from_proposal_by_Eric_with_assumed_tolerances_for_tolfdif.env (1.64 MB), T3TRK_reoptimized_from_proposal_by_Eric_with_assumed_tolerances_for_tolfdif.len (60.28 KB), untitled.env (43.49 KB), untitled.len (70.28 KB), WFOV107_reopt_by_Harvey.env (343.81 KB), WFOV107_reopt_by_Harvey.len (346.46 KB), WIDE92_ReOptimized_Eric_Prescription.SEQ (12.78 KB), WIDE92_T3TRK_reoptimized_BEST_monte_carlo_lens.env (1.89 MB), WIDE92_T3TRK_reoptimized_BEST_monte_carlo_lens.len (66.84 KB), WIDE92_T3TRK_reoptimized_from_proposal_by_Eric_set_up_for_pupil_area.len (64.01 KB), WIDE92_T3TRK_reoptimized_from_proposal_by_Eric_with_assumed_tolerances_for_tolfdif_and_tolmonte.env (1.65 MB), WIDE92_T3TRK_reoptimized_WORST_monte_carlo_lens.len (58.19 KB), wide104.seq (6.22 KB), WIDE104_SET_UP_FOR_COLLECTING_AREA_ANALYSIS.env (1.09 MB), WIDE104_SET_UP_FOR_COLLECTING_AREA_ANALYSIS.len (63.82 KB), WIDE107.seq (10.02 KB), WIDE107_SET_UP_FOR_COLLECTING_AREA_ANALYSIS.1.len (63.94 KB), WIDE107_SET_UP_FOR_COLLECTING_AREA_ANALYSIS.2.len (63.94 KB), WIDE107_SET_UP_FOR_COLLECTING_AREA_ANALYSIS.3.len (63.97 KB), WIDE107_SET_UP_FOR_COLLECTING_AREA_ANALYSIS.env (5.29 MB), WIDE107_SET_UP_FOR_COLLECTING_AREA_ANALYSIS.len (63.97 KB), WIDE107_T3TRK_reoptimized_FAVORING_OFF_AXIS_monte_carlo_lens.1.len (71.61 KB), WIDE107_T3TRK_reoptimized_FAVORING_OFF_AXIS_monte_carlo_lens.2.len (71.61 KB), WIDE107_T3TRK_reoptimized_FAVORING_OFF_AXIS_monte_carlo_lens.env (514 Bytes), WIDE107_T3TRK_reoptimized_FAVORING_OFF_AXIS_monte_carlo_lens.len (71.61 KB), WIDE107_T3TRK_reoptimized_FLEAST_DEGRADED_monte_carlo_lens.1.len (71.65 KB), WIDE107_T3TRK_reoptimized_FLEAST_DEGRADED_monte_carlo_lens.2.len (71.65 KB), WIDE107_T3TRK_reoptimized_FLEAST_DEGRADED_monte_carlo_lens.env (6.88 MB), WIDE107_T3TRK_reoptimized_FLEAST_DEGRADED_monte_carlo_lens.len (71.65 KB)

Exit full screen

A true and correct copy of a forensic report detailing the metadata for this email and listing its attachments is attached as Exhibit 3.

23. On the same evening, July 17, 2026, between 6:36 p.m. and 11:01 p.m. Pacific Time, Spencer sent seven separate emails to his personal Gmail account (glasair470@gmail.com) attaching a total of 525 NIS proprietary files. Plaintiffs' forensic records capture the subject lines of these emails, which reference specific

NIS programs and design categories, confirming that the exfiltration was deliberate and targeted rather than inadvertent.

24. The subject lines of the seven emails sent on July 17 included references to specific NIS optical designs, sensor architectures, and program designations. These subject lines demonstrate that Spencer systematically organized the stolen files by program and design type before transmitting them, evidencing premeditation and an intent to maintain usable access to NIS's trade secrets outside of Plaintiffs' protective controls.

25. In total, between July 12 and July 17, 2026, Spencer exfiltrated at least 642 files containing NIS trade secrets: 51 files in the T3TRK_optical_designs.zip archive on July 12; 66 files sent to his email at his new employer on July 17; and 525 files sent to his personal Gmail on July 17. The combined volume of this exfiltration—in file count, data size, and the breadth of programs affected—demonstrates systematic looting rather than the casual retention of work product.

26. Spencer's exfiltration was not authorized by Plaintiffs. No supervisor, manager, or authorized representative of NIS or Leonardo DRS gave Spencer permission to transmit proprietary files to any personal email account or to any email address at his new employer. The transmissions violated CITG-001 §§ 4.5.1 and 4.5.4, the Code of Ethics, and Spencer's duty of loyalty to his employer.

27. At the time of the exfiltration, Spencer owed Plaintiffs the undivided loyalty of a current employee. His decision to transmit 66 files directly to his email address at his new employer while still employed by NIS constitutes a breach of the most fundamental obligation an employee owes an employer: the duty not to act against the employer's interests while on the employer's payroll.

**C. Spencer's Failed Attempt to Hide His Tracks**

28. On July 22, 2026, between 18:59 and 19:08 UTC (11:59 a.m. and 12:08 p.m. Pacific Time), a span of nine minutes, Spencer tried to delete more than 6,000 files from NIS's systems. This mass deletion attempt occurred after Spencer

had completed his exfiltration of trade secrets, including his transmission of NIS files to his email account at his new employer, suggesting an intent to cover his tracks and deprive Plaintiffs of access to their own proprietary work product.

29. The more than 6,000 files Spencer tried to delete include design files, engineering analyses, and program documentation. The attempted deletion interfered with the work of Spencer's colleagues at NIS by depriving them of information they regularly used.

30. NIS's investigation determined that the files Spencer tried to delete were drawn from at least five project folders: Muzilla_fisheye, Arctic_Char, David_Shafer_papers, DLE_field_collimator, and T3TRK_optical_designs. The breadth of the attempted deletion—spanning multiple programs and design categories—suggests that Spencer's purpose was not to clean up personal files but to destroy evidence of what he had taken and to inflict maximum damage on NIS's engineering capabilities.

31. The timing and scope of the attempted deletion support an inference of spoliation. Spencer tried to delete the files after exfiltrating them to his personal Gmail and new employer email accounts. Having secured copies of Plaintiffs' trade secrets for himself and his new employer, he systematically attempted to destroy the originals from Plaintiffs' systems. If further investigation establishes that Spencer succeeded in permanently deleting files that cannot be recovered, his conduct gives rise to a presumption that those files contained evidence adverse to Spencer's interests and favorable to NIS's claims.

### D. Nature and Value of the Trade Secrets

32. The misappropriated trade secrets relate to three active defense programs of substantial value: (a) the TRKT3 payload, a next-generation infrared tracking system designed for space-based missile warning applications; (b) the TRKT2 proposal, involving advanced optical sensor designs for a competitive procurement; and (c) NIS's ground demonstration for the SDA, a program of record

for the Proliferated Warfighter Space Architecture. All three programs are competitively bid, and NIS and Spencer's new employer are direct competitors for each.

33. The misappropriated designs derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by, other persons who can obtain economic value from their disclosure or use. Plaintiffs' optical designs represent years of iterative development, testing, and refinement. A competitor in possession of these designs could replicate Plaintiffs' capabilities without incurring the substantial research and development costs that NIS invested, thereby gaining an unfair and unlawful competitive advantage.

34. A substantial portion of the exfiltrated files constitutes CUI generated under contracts with the United States Government. Such information may be subject to the ITAR, 22 C.F.R. Parts 120–130, and the EAR, 15 C.F.R. Parts 730–774. The unauthorized removal of this information from NIS's controlled environment and its transmission to personal and competitor email systems may constitute violations of federal export control laws independent of the trade secret claims asserted herein.

35. The value of the misappropriated trade secrets cannot be precisely quantified at this stage of the litigation, but it is substantial. The TRKT3 program alone represents a contract opportunity valued in the hundreds of millions of dollars. The competitive harm to NIS from Spencer's new employer's possession of NIS's proprietary designs—including the ability to underbid NIS using NIS's own cost-optimized designs—is incalculable and constitutes irreparable injury.

**E. Plaintiffs' Demands and Defendant's Non-Compliance**

36. On July 31, 2026, counsel for NIS sent a letter to Spencer setting forth nine specific demands designed to mitigate the harm from Spencer's exfiltration and prevent further dissemination of NIS's trade secrets. The letter imposed a deadline of August 7, 2026, for compliance.

37. The nine demands included, among other things: (1) immediate return of all NIS proprietary information in Spencer's possession; (2) preservation of all documents and data relating to the exfiltration; (3) identification of all persons to whom NIS information had been disclosed; (4) written confirmation that no NIS information had been provided to his new employer beyond the 66 files already identified; (5) an attestation that Spencer would not use or disclose NIS trade secrets in his work for his new employer; (6) consent to a forensic examination of Spencer's personal devices; (7) cooperation in identifying and recovering the files he attempted to delete; (8) return of all NIS equipment; and (9) an accounting of all NIS information transmitted to any third party.

38. On August 7, 2026—the deadline date—Spencer responded through his counsel, Torin A. Dorros. The response addressed only demands 5 and 7. As to demand 5, Spencer offered a commitment not to use Plaintiffs' trade secrets but qualified it with a self-judging exception, reserving the right to use information that Spencer himself determines is "general knowledge, skill, and experience." This carve-out swallows the commitment whole: it permits Spencer to use any of Plaintiffs' trade secrets so long as he self-servingly characterizes them as general knowledge, with no independent verification and no mechanism for Plaintiffs to challenge his characterization.

39. As to demand 7, Spencer's response offered limited cooperation in identifying files he tried to delete but imposed conditions and limitations that are inconsistent with good-faith compliance. Spencer did not address demands 1, 2, 3, 4, 6, 8, or 9. He did not return any NIS proprietary information. He did not consent to a forensic examination of his devices. He did not identify the recipients of NIS information beyond what NIS had already independently determined from its forensic records.

40. On August 10, 2026, counsel for Plaintiffs replied to Spencer's counsel, noting the manifest inadequacy of Spencer's August 7 response,

demanding full compliance with all nine demands, and extending the compliance deadline to August 12, 2026. Plaintiffs' letter made clear that failure to comply by August 12 would result in the filing of this action.

41. Spencer's counsel replied on August 12, 2026, but declined to agree to several of Plaintiffs' demands, in particular the demand for a forensic inspection and confirmed destruction of all copies of the exfiltrated files.

## CLAIMS FOR RELIEF

### COUNT ONE
### Misappropriation of Trade Secrets Under the Defend Trade Secrets Act 18 U.S.C. § 1836 et seq.

42. Plaintiffs incorporate by reference paragraphs 1 through 41 as though fully set forth herein.

43. Plaintiffs' optical and infrared sensor designs, including without limitation the Zemax design files, lens prescriptions, glass catalogs, sensor architectures, and related engineering documentation described above, constitute "trade secrets" within the meaning of 18 U.S.C. § 1839(3) because they are forms of financial, business, scientific, technical, and engineering information that derive independent economic value from not being generally known to the public and are the subject of reasonable measures to maintain their secrecy.

44. The trade secrets are "related to a product or service used in, or intended for use in, interstate or foreign commerce" within the meaning of 18 U.S.C. § 1836(b)(1). Plaintiffs' optical and FLIR systems are sold and used across state lines and internationally.

45. Spencer "misappropriated" Plaintiffs' trade secrets within the meaning of 18 U.S.C. § 1839(5) by acquiring the trade secrets through improper means, including breach of a duty to maintain secrecy and unauthorized copying and transmission, and by disclosing the trade secrets to his new employer without Plaintiffs' consent.

As a direct and proximate result of Defendant's misappropriation, Plaintiffs have suffered and will continue to suffer actual loss. Plaintiffs are entitled to damages under 18 U.S.C. § 1836(b)(3)(B), including damages for actual loss, damages for Defendant's unjust enrichment not addressed in computing actual loss, and, in lieu of damages measured by any other methods, a reasonable royalty. Because Defendant's misappropriation was willful and malicious, Plaintiffs are entitled to exemplary damages up to two times the amount of compensatory damages under 18 U.S.C. § 1836(b)(3)(C) and reasonable attorneys' fees under 18 U.S.C. § 1836(b)(3)(D).

**COUNT TWO**
**Misappropriation of Trade Secrets Under the California Uniform Trade Secrets Act**
**Cal. Civ. Code § 3426 et seq.**

47. Plaintiffs incorporate by reference paragraphs 1 through 41 as though fully set forth herein.

48. Plaintiffs' optical and infrared sensor designs constitute "trade secrets" within the meaning of California Civil Code § 3426.1(d) because they derive independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from their disclosure or use and are the subject of efforts that are reasonable under the circumstances to maintain their secrecy.

49. Defendant's conduct constitutes "misappropriation" within the meaning of California Civil Code § 3426.1(b) through the acquisition, disclosure, and use of Plaintiffs' trade secrets by improper means and in breach of a duty to maintain secrecy.

50. As a direct and proximate result of Defendant's misappropriation, Plaintiffs have been damaged in an amount to be proven at trial. Plaintiffs are entitled to injunctive relief under California Civil Code § 3426.2, damages under § 3426.3 including both actual loss and unjust enrichment, and, because the

misappropriation was willful and malicious, exemplary damages not exceeding twice the compensatory award under § 3426.3(c) and attorneys' fees under § 3426.4.

**COUNT THREE**
**Violation of the California Comprehensive Computer Data Access and Fraud Act**
**Cal. Penal Code § 502**

51. Plaintiffs incorporate by reference paragraphs 1 through 41 as though fully set forth herein.

52. Plaintiffs' computer systems, servers, and electronic storage devices constitute "computers" and "computer systems" within the meaning of California Penal Code § 502(b). Plaintiffs' trade secret design files and proprietary data constitute "data" within the meaning of § 502(b)(8).

53. Spencer knowingly accessed and without permission took, copied, and made use of data from Plaintiffs' computer systems in violation of California Penal Code § 502(c)(2). Spencer knowingly and without permission used or caused to be used computer services in violation of § 502(c)(3). Spencer knowingly accessed and without permission added to, altered, damaged, deleted, or destroyed data on NIS's computer systems in violation of § 502(c)(4) by attempting to delete more than 6,000 files on July 22, 2026.

54. As a direct and proximate result of Spencer's violations of § 502, NIS has suffered damage and loss, the costs of forensic investigation, and competitive harm from the disclosure of trade secrets. Pursuant to California Penal Code § 502(e)(1), NIS is entitled to compensatory damages, including expenditures reasonably and necessarily incurred to verify whether its computer systems and data were altered, damaged, or deleted, and to investigate the full scope of Spencer's unauthorized access.

**COUNT FOUR**
**Breach of Contract**

55. Plaintiffs incorporate by reference paragraphs 1 through 41 as though fully set forth herein.

56. Spencer entered into binding contractual obligations with Plaintiffs through his acknowledgment of the Code of Ethics on March 4, 2009, and his agreement to the Cyber/IT Acceptable Use Policy, CITG-001. These agreements constitute valid, enforceable contracts supported by adequate consideration, including Spencer's employment, compensation, and access to Plaintiffs' proprietary information.

Plaintiffs performed all conditions, covenants, and obligations required of them under these agreements, or were excused from such performance.

58. Spencer breached these agreements by: (a) transmitting Plaintiffs' proprietary and trade secret information to his personal email account in violation of CITG-001 § 4.5.1; (b) transmitting Plaintiffs' proprietary information to his email account at his new employer in violation of CITG-001 § 4.5.4; (c) removing proprietary data from Plaintiffs' systems without authorization in violation of CITG-001 § 4.5.4; (d) disclosing confidential business information to unauthorized persons in violation of the Code of Ethics; and (e) attempting to delete more than 6,000 files from Plaintiffs' systems in violation of his obligation to safeguard company property.

59. As a direct and proximate result of Spencer's breaches, Plaintiffs have suffered damages in an amount to be proven at trial, including the value of the information taken in breach of these contracts, the cost of forensic investigation, and competitive harm.

**COUNT FIVE**
**Breach of the Duty of Loyalty**

60. Plaintiffs incorporate by reference paragraphs 1 through 41 as though fully set forth herein.

61. Under California law, an employee owes a duty of loyalty to his or her employer during the existence of the employment relationship. This duty prohibits an employee from acting in a manner adverse to the employer's interests, from competing with the employer while employed, and from taking the employer's property for the benefit of a competitor.

62. Spencer breached his duty of loyalty to Plaintiffs by: (a) accepting employment with a direct competitor while still employed by NIS; (b) on information and belief, simultaneously drawing a salary from both NIS and his new employer; (c) transmitting Plaintiffs' trade secrets directly to his email address at his new employer while still employed by NIS; (d) systematically exfiltrating Plaintiffs' proprietary files for the benefit of himself and his new employer; and (e) attempting to delete more than 6,000 files from Plaintiffs' systems to conceal his misconduct and harm Plaintiffs' operations.

63. As a direct and proximate result of Spencer's breach of the duty of loyalty, Plaintiffs have suffered damages in an amount to be proven at trial, including the value of the information taken in breach of the duty of loyalty, the cost of forensic investigation, lost competitive advantage, and lost profits.

**COUNT SIX**
**Conversion**
*(Pleaded in the Alternative)*

64. Plaintiffs incorporate by reference paragraphs 1 through 41 as though fully set forth herein.

65. Plaintiffs are and at all relevant times were the rightful owners and possessors of the trade secret design files, proprietary data, and other property described herein. Plaintiffs' ownership interest extends to the electronic files and

data that embody its trade secrets, including the physical media on which such data is stored.

66. Spencer, without authorization and in violation of Plaintiffs' property rights, took possession of and exercised dominion and control over Plaintiffs' proprietary files by copying and transmitting them to his personal email account and to his new employer.

67. This claim is pleaded in the alternative to Plaintiffs' trade secret claims to the extent that California Civil Code § 3426.7 may preempt claims based on the same nucleus of facts. To the extent any misappropriated information is determined not to qualify as a trade secret, this conversion claim stands independently.

68. As a direct and proximate result of Defendant's conversion, Plaintiffs have suffered damages in an amount to be proven at trial.

**COUNT SEVEN**
**Unfair Competition**
**Cal. Bus. & Prof. Code § 17200 et seq.**

69. Plaintiffs incorporate by reference paragraphs 1 through 41 as though fully set forth herein.

70. California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq.*, prohibits any "unlawful, unfair, or fraudulent business act or practice."

71. Defendant's conduct constitutes an "unlawful" business practice because it violates the Defend Trade Secrets Act, the California Uniform Trade Secrets Act, California Penal Code § 502, and Defendant's contractual and fiduciary obligations.

72. Defendant's conduct constitutes an "unfair" business practice because the harm to Plaintiffs substantially outweighs any utility of Defendant's conduct, and because Defendant's conduct violates established public policy favoring the protection of trade secrets and the sanctity of contractual obligations.

73. Defendant's conduct constitutes a "fraudulent" business practice because Spencer's continued work at NIS while secretly employed by his new employer was inherently deceptive, and because Defendant's acquisition and retention of Plaintiffs' trade secrets was accomplished through deceit and subterfuge.

74. Defendant has been unjustly enriched as a result of his unfair competition. Pursuant to Cal. Bus. & Prof. Code § 17203, Plaintiffs are entitled to restitution of all money or property acquired by means of Defendant's unfair competition, and injunctive relief to prevent further unfair business practices.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs DRS Network & Imaging Systems, LLC and Leonardo DRS, Inc. respectfully pray for judgment against Defendant Harvey Spencer as follows:

A. A temporary restraining order, preliminary injunction, and permanent injunction enjoining Defendant and his agents, servants, employees, attorneys, and all persons in active concert or participation with him from using, disclosing, disseminating, or otherwise exploiting any of Plaintiffs' trade secrets or proprietary information;

B. An order requiring Defendant to submit to a forensic examination by Digital Mountain or another qualified third-party forensic firm, at Defendant's expense, of all computers, devices, email accounts, cloud storage, and other media to identify and sequester all of Plaintiffs' proprietary information in Defendant's possession, custody, or control;

C. Compensatory damages in an amount to be proven at trial for actual loss caused by Defendant's misappropriation, including but not limited to lost profits, diminished competitive position, and the cost of remediation;

D. Disgorgement of all profits, benefits, and unjust enrichment derived by Defendant from his misappropriation of NIS's trade secrets;

E. In the alternative to compensatory damages measured by actual loss or unjust enrichment, a reasonable royalty for Defendant's unauthorized use of Plaintiffs' trade secrets pursuant to 18 U.S.C. § 1836(b)(3)(B)(ii) and Cal. Civ. Code § 3426.3(b);

F. Exemplary damages in an amount up to two times the compensatory damages award under the Defend Trade Secrets Act, 18 U.S.C. § 1836(b)(3)(C), based on Defendant's willful and malicious misappropriation;

G. Exemplary damages in an amount up to two times the compensatory damages award under the California Uniform Trade Secrets Act, Cal. Civ. Code § 3426.3(c), based on Defendant's willful and malicious misappropriation;

H. Punitive damages pursuant to California Civil Code § 3294 in an amount sufficient to punish Defendant and deter similar conduct, based on Defendant's oppression, fraud, and malice;

I. Restitution of all money or property acquired by means of Defendant's unfair competition pursuant to Cal. Bus. & Prof. Code § 17203;

J. Damages for expenditures reasonably and necessarily incurred by Plaintiffs to investigate and respond to Defendant's unauthorized access to and damage of NIS's computer systems pursuant to Cal. Penal Code § 502(e)(1);

K. Reasonable attorneys' fees and costs pursuant to 18 U.S.C. § 1836(b)(3)(D), Cal. Civ. Code § 3426.4, Cal. Penal Code § 502(e)(2), and any other applicable statute;

L. Pre-judgment and post-judgment interest at the maximum rate permitted by law;

M. Such other and further relief as this Court deems just and proper.

Dated: August 14, 2026

KILPATRICK TOWNSEND & STOCKTON LLP

By:/s/ *Eric B. Evans*
Eric B. Evans

Attorneys for Plaintiffs
DRS Network & Imaging Systems, LLC
and Leonardo DRS, Inc.

**DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury on all issues so triable in this action.

Dated: August 14, 2026

KILPATRICK TOWNSEND & STOCKTON LLP

By: /s/ *Eric B. Evans*
Eric B. Evans
Attorneys for Plaintiffs
DRS Network & Imaging Systems, LLC
and Leonardo DRS, Inc.